# IN THE COURT OF APPEALS OF IOWA

No. 24-0663
Filed November 13, 2025


**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JASON DAVID HOCKING,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County,
Linda M. Fangman, Judge.


        A defendant appeals his conviction for robbery in the first degree.
**AFFIRMED.**


        Colin McCormack of Van Cleaf & McCormack Law Firm, LLP, Des Moines,
for appellant.

        Brenna Bird, Attorney General, and David Banta, Assistant Attorney
General, for appellee.


        Considered without oral argument by Schumacher, P.J., Langholz, J., and
Telleen, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2025).

**TELLEEN, Senior Judge.**

Jason Hocking appeals his conviction for robbery in the first degree, arguing insufficient evidence supported his conviction.

## I.     Background Facts and Proceedings

In September 2023, Joshua Harris and his wife were driving past the Waterloo mechanic shop he owned.  The shop was closed, but Harris noticed the doors of a customer's car were open and a man was looking under the vehicle's hood.  He observed that the individual was not Justin Wentz, the shop's co-owner, so Harris called Wentz and had his wife turn their car around so that he could watch the individual from the next street over.  Harris watched the individual "for less than a minute," then got out of his car, ran up to the customer's vehicle, "took [his] shirt off" and "took everything out of [his] pockets," prepared "to defend [his] property if [he] had to."

Harris confronted the man, later confirmed to be Hocking, at the customer's vehicle.  Hocking provided contradictory explanations for why he was at the vehicle, claiming both that "it was his car" and that he wanted to purchase it, but was carrying tools that "would not go with a car . . . that you owned"—specifically, a "brake lock," often used for hot wiring cars, which permits the user to start a vehicle without the user being behind the steering wheel.  Harris was still on the phone with Wentz at this time, and Wentz told Harris to "keep him there."  Harris then chased Hocking around the vehicle and told Hocking he would "pull [his] pistol out," though Harris testified that he was bluffing and had not brought a firearm with him.  According to Harris, Hocking "acted like he wanted to rush me" and "had

something in his hand that was behind him"—"a pointed object." Harris confirmed that he "had no sense of time," "everything was quick," and cited that his health problems made his memory "a little cloudy."

During this scuffle Wentz showed up on the scene. Wentz "flies across the parking lot" and engaged in a melee against the driver's door of the vehicle. At some point during the fight, Hocking "lifted up" the screwdriver while Wentz was "rushing him." Around this time, Harris and Wentz forced Hocking into the vehicle. Harris called 911 to report an attempted assault and vehicle theft by Hocking, and he and Wentz worked to keep Hocking inside the vehicle. Harris testified to have seen Wentz's firearm while they were forcing Hocking into the vehicle and reported to 911 that they both had permits to carry and were carrying at the time of the attempted theft.

When officers arrived at the scene, Harris reported that Hocking attempted to steal a customer's vehicle. Hocking denied that he was attempting to steal the vehicle but admitted to using the brake lock, which Harris and Wentz confirmed they did not own. Harris opined to a responding officer that Hocking must have been experienced in car theft because the vehicle he was attempting to steal, a Chrysler 300, is "not hard to hotwire." Officers observed that Hocking appeared to be under the influence of methamphetamine and placed him in a squad car where he began quietly talking to himself. The responding officers then searched for the screwdriver with which Harris and Wentz claimed Hocking had threatened them. Officers found the screwdriver in Hocking's pocket, Hocking confirmed the screwdriver belonged to him, and Harris reported that it was the screwdriver he earlier saw Hocking holding.

Hocking was charged with robbery in the first degree (count I) and possession of burglar's tools (count II), and a jury convicted him as charged. The district court sentenced Hocking to twenty-five years on count I and two years on count II, to be served concurrently. Hocking now appeals.

## II.     Standard of Review

We review challenges to the sufficiency of evidence for correction of legal error. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We consider the record evidence "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from [that] evidence." *Id.* (citation omitted). If the evidence could convince a rational fact finder of the defendant's guilt beyond reasonable doubt, we will uphold the verdict. *Id.*

## III.     Discussion

Hocking challenges the sufficiency of the evidence supporting his conviction for robbery in the first degree. The jury instructions informed the jury that the State was required to prove:

> 1. On or about the 19th day of September, 2023, [Hocking] had the specific intent to commit a theft as defined in Instruction 17.[1]
> 2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, [Hocking]:
>> (a) Committed an assault on Joshua Harris or Justin Wentz . . . OR
>> (b) Threatened Joshua Harris or Justin Wentz with, or purposely put Joshua Harris or Justin Wentz in fear of immediate serious injury, OR
>> (c) Threatened to immediately commit Willful Injury . . . .
> 3. [Hocking] was armed with a dangerous weapon.

---

[1] Instruction 17 defined "theft" as "taking possession or control of property with the intent to deprive the owner."

The term "assault" included acts which "place another person in fear of immediate physical contact which will be painful, injurious, or offensive to another person, when coupled with the apparent ability to do the act; or intentionally displays a dangerous weapon in a threatening manner towards another."

We can quickly dispose of Hocking's claim based on his argument on the second possible element: whether he put Harris or Wentz in fear of immediate serious injury. On this element, Hocking only argues that "even if the jury were to assume that [Hocking's] alleged movement towards Mr. Harris was sufficient to constitute a threat, there was no evidence offered by the State that being stabbed with a screwdriver would constitute a serious injury as defined by the Iowa Code." But our supreme court has directly addressed this argument, stating:

> It is manifest there are many articles and instruments other than those specifically named in the section which might properly come within the scope of an 'offensive or dangerous weapon' if they were used or carried for use as weapons, [e.g.], pocket knives, razors, hammers, *screwdrivers*, ice picks, hatpins, chains, and many others, which are manufactured and generally used for peaceful and proper purposes.

*State v. Hill*, 140 N.W.2d 731, 733 (Iowa 1966). We agree with our supreme court that a screwdriver could be a dangerous weapon, and thus, could cause serious injury if used as a weapon. That is particularly true in a case such as this one in which Hocking was physically confronted and surprised by a property owner while in the process of committing a theft and additionally observed to be acting erratically—consistent with the behavior of a person under the influence of methamphetamine. *Cf. id.* ("Whether or not such implements are offensive or dangerous weapons, within the meaning of those terms as used in [the Code], would then depend upon the use which the carrier made or intended to make of

them."). Lastly, Harris stated that he could not immediately discern the object as a screwdriver, only identifying that Hocking was challenging him with a "pointy object" in the dark of the night.

Additionally, both Harris and Wentz testified that Hocking looked like he was intending to use a screwdriver against them as a weapon, with Wentz testifying it "looked like [Hocking] was coming towards [Harris] with a screwdriver." Wentz, who was carrying a Kimber 1911 handgun, stowed his handgun in his vehicle once Hocking "dropped the screwdriver . . . and was not a threat anymore." And Harris confirmed that Hocking was "cocking back with the screwdriver" just as Wentz pulled up to the scene. These two pieces of testimony are entirely consistent with each other. Hocking attempts to cast Harris's and Wentz's testimony as inconsistent due to differing accounts of at what points during the altercation that Wentz was in possession of his firearm. Although Wentz testified that he put his firearm away once Hocking dropped the screwdriver, Harris testified he saw Wentz with his firearm while they were forcing Hocking into the customer's vehicle.

This specific firearm-possession timeline is irrelevant to whether Wentz or Harris were assaulted or in fear of immediate serious injury, but Hocking uses the inconsistency to cast doubt on all their testimony. But Harris admitted that he "had no sense of time" and that his medical issues made it difficult to accurately reconstruct the timeline of events. And there is a clear distinction between inaccurately recalling a timeline of events and making up events whole cloth. The task of "resolv[ing] conflicts in the evidence, . . . pass[ing] upon the credibility of witnesses, . . . determin[ing] the plausibility of explanations, or . . . weigh[ing] the evidence; such matters are for the jury." *State v. Mathis,* 971 N.W.2d 514, 519

(Iowa 2022). A jury could reasonably concur that Harris or Wentz remembered being assaulted but had difficulty recalling the specific timeline of events. Sufficient evidence was presented to conclude beyond a reasonable doubt that Hocking committed robbery in the first degree, and we thus affirm his conviction.

**AFFIRMED.**